Joshua Briones (SBN 205293)
jbriones@mintz.com
Nicole V. Ozeran (SBN 302321)
nvozeran@mintz.com
MINTZ LEVIN COHN FERRIS GLOVSKY
  AND POPEO P.C.
2029 Century Park East Suite 3100
Los Angeles, CA 90067
Telephone: 310-586-3200
Facsimile: 310-586-3202

Claire C. Newland (SBN 301017)
ccnewland@mintz.com
MINTZ LEVIN COHN FERRIS GLOVSKY
  AND POPEO P.C.
44 Montgomery Street, 36th Floor
San Francisco, CA 94104
Telephone: 415-432-6000
Facsimile: 415-432-6001

Attorneys for Defendant
YELP INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JONATHAN SAPAN, individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　Plaintiff,<br>　vs.<br><br>YELP INC., a Delaware Corporation,<br><br>　　　　　Defendant. | Case No. 3:17-cv-03240-JD<br><br>**DEFENDANT YELP INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing:<br>Date:　　April 5, 2018<br>Time:　　10:00 a.m.<br>Dept.:　　11<br>Judge:　　Honorable James Donato<br><br>Complaint Filed: June 6, 2017 |

## I. INTRODUCTION

Plaintiff Jonathan Sapan's ("Plaintiff") registration of his Yelp account and continuous use of Yelp over hundreds of days, during which he repeatedly agreed to Yelp's Terms of Service, posted dozens of reviews of businesses, flagged other users' reviews, made suggested edits to Yelp business pages, used Yelp's direct messaging feature, and used other Yelp features—many available only to registered users like Plaintiff—created an established business relationship ("EBR") with Yelp Inc. ("Yelp"). This EBR is an exception to liability under the TCPA's plain language.

Although an EBR can be based solely on a single non-monetary transaction between parties, here the parties have a long history of engagement. Since 2013, Plaintiff has used Yelp on nearly 500 different dates (again reiterating his agreement to the Yelp Terms of Service each time he logged in), authored and posted 42 reviews, voted or received votes on his reviews 121 times, sent invites to make friends on Yelp seven times, messaged other users eight times, flagged eight reviews authored by other users, suggested edits to Yelp business pages five times, and even visited the Tierrasanta Pro Roofing Yelp business page that allegedly displayed his phone number five times prior to bringing this action. These continuous transactions between the parties form an EBR.

Additionally, the FCC specifically notes that a publisher-subscriber relationship, such as the one between Yelp and Plaintiff, forms an EBR, and, the FCC and case law make clear that no sale or exchange of funds are necessary for this relationship to exist.

Accordingly, Yelp and Plaintiff have an EBR, Yelp's alleged calls to Plaintiff do not give rise to a claim, and this matter must be dismissed in its entirety.

## II. ARGUMENT

### A. A Publisher-Subscriber Relationship Forms an EBR

The Federal Communications Commission ("FCC") specifically identifies the publisher-subscriber relationship as an example of an EBR. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752, 8771, ¶ 35 (1992). Plaintiff's unsupported contention that the "publisher-subscriber relationship referred to paying subscribers to print publications" (Opp., p. 12:10-11) is entirely unsupported and contrary to case law.

In *CE Design, Ltd. v. Prism Bus. Media, Inc*., 606 F.3d 443 (7th Cir. 2010), CE Design brought suit against Prism Business Media, Inc. ("Prism"), a media company that published trade magazines, under the TCPA. *Id*. at 445-46, *affirming CE Design Ltd. v. Prism Business Media, Inc.*, 2009 U.S. Dist. LEXIS 70712 (N.D. Ill. Aug. 12, 2009). Although CE Design had never bought any services from Prism or sold any services to Prism, the Court found that the parties had an EBR because CE Design subscribed to three of Prism's free publications. *Id.* at 451 ("And because Prism and CE Design's publisher-subscriber relationship falls within the scope of business relationships the FCC intended the EBR defense to cover, we also agree that the EBR exemption applies in this case.")

The publisher-subscriber relationship between Plaintiff and Yelp is even stronger than the relationship in *CE Design, Ltd.,* because internet services like Yelp now enable subscribers like Plaintiff to not only consume published content, but to also add their own content and directly interact with the service and other subscribers (*e.g*., befriend other subscribers, message other subscribers, receive emails from the service, and report content contributed by others to the service).

Furthermore, despite Plaintiff's contentions to the contrary, Yelp's reliance on Section 230 of the Communications Decency Act[1] in cases concerning alleged liability for third-party content is irrelevant to this action. Here, Plaintiff is attempting to hold Yelp liable for making phone calls. All that is relevant for this case is that courts have unanimously found Yelp to be a "publisher." *Kimzey*, 836 F.3d at 1268; *Levitt v. Yelp! Inc.*, 2011 U.S. Dist. LEXIS 124082, at *28 (N.D. Cal. Oct. 26, 2011), *aff'd* 765 F.3d 1123 (9th Cir. 2014); *Yelp Inc. v. Superior Court*, 17 Cal. App. 5th 1 (Cal. App. 2017). Again, Plaintiff provides no case law to suggest that the immunity Congress provided online publishers through Section 230 somehow also precludes an online publisher from forming an EBR with a subscriber.

The parties' publisher-subscriber relationship demonstrates that an EBR exists here and that Yelp is exempted from liability under the TCPA for the calls allegedly placed to Plaintiff.

---

[1] Section 230 generally immunizes online publishers from claims based on content created by their users. 47 U.S.C. § 230(c)(1); *see generally, Kimzey v. Yelp! Inc.*, 836 F.3d 1263 (9th Cir. 2016).

DEFENDANT YELP INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:17-cv-03240-JD

## B. Plaintiff's Repeated Acceptance of Yelp's Terms of Service Constitutes Transactions between the Parties

In exchange for his ability to use various features on Yelp to which he would not otherwise have access, Plaintiff assented to Yelp's Terms of Service. MacBean Decl. ¶¶ 9-12. Plaintiff accepted these Terms when he first created his account, and each time that he later logged in to his account. *Id*. The hyperlinked[2] Terms of Service was visible on the Yelp sign up and login page. *Id*. at ¶¶ 10, 11. By clicking the "Sign Up" and "Log In" buttons, Plaintiff "agree[d] to Yelp's Terms of Service and Privacy Policy" and entered into a binding contract with Yelp. *Id.*; *see Holl v. UPS*, 2017 U.S. Dist. LEXIS 153317, *12 (N.D. Cal. Sept. 18, 2017) (finding that plaintiff had sufficient inquiry notice of Terms even where "users are not provided with a hyperlink, but instead are directed to navigate to ups.com"); *Tompkins v. 23andMe, Inc*., 2014 U.S. Dist. LEXIS 88068, *29 (N.D. Cal. June 25, 2014) (finding that "[t]he fact that the TOS were hyperlinked and not presented on the same screen does not mean that customers lacked adequate notice" of the contract terms); *Swift v. Zynga Game Network, Inc*., 805 F. Supp. 2d 904, 912 (N.D. Cal. 2011) (enforcing arbitration provision where "Plaintiff was provided with an opportunity to review the terms of service in the form of a hyperlink immediately under the 'I accept' button"). Courts have consistently found that such online agreements are valid and enforceable.

Plaintiff does not contest that he agreed to Yelp's Terms of Service each time he logged in to Yelp. *See generally* Opp. Instead he relies on unpersuasive case law to argue that the contract he entered into "cannot be enforceable" (Opp. at 10:21) and that agreeing to the Terms of Service does not constitute a "transaction." This is incorrect—case law holds that the contract is enforceable and agreeing to Terms of Service is a transaction.

---

[2] Plaintiff claims that the Terms of Service were "linked in browse-wrap fashion," (Opp. at 10:17); however, Yelp's Terms of Service are more akin to a click-wrap agreement, where an offeree has an opportunity to review the terms and conditions and must affirmatively indicate assent. *See Specht v. Netscape Commc'ns Corp*., 306 F.3d 17, 22 n.4 (2d Cir. 2002).

### 1. Yelp's Terms of Service are Enforceable

Plaintiff's reliance on *Specht v. Netscape Commc'ns. Corp.*, 306 F.3d 17 (2nd Cir. 2002) and *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171 (9th Cir. 2014) is misplaced. In *Specht*, the court held that "a consumer's clicking on a . . . button does not communicate assent to contractual terms if the offer did not make clear to the consumer that clicking on the . . . button would signify assent to those terms." *Specht*, 306 F.3d at 29-30. In the instant matter, the text making the offer and a link to the Terms of Service appeared immediately above the "Sign Up" button and immediately below the "Log In" button. MacBean Decl. ¶¶ 10-11 (E.g., "By logging in you agree to Yelp's Terms of Service and Privacy Policy"). By clicking the buttons, Plaintiff assented to the Terms of Service as made clear by the text of the offer Yelp provided.

In *Nguyen* there was no such disclosure from the website that connected the act of clicking on a button (there, to complete a purchase) and agreement to the Terms of Use—instead, the link to the Terms of Use was presented on its own, at the bottom of the webpage, without elucidation. Thus, there was no evidence that the plaintiff had to "affirmatively acknowledge the Terms of Use before completing his online purchase," and the court acknowledged that such a requirement could have changed the "outcome" of the case. *Nguyen*, 763 F.3d at 1176. Again, here Yelp clearly disclosed to Plaintiff, through clear language immediately adjacent to the button, that clicking the button meant assenting to the Terms of Service. MacBean Decl. ¶¶ 10-11 (E.g., "By logging in you agree to Yelp's Terms of Service and Privacy Policy").

Neither *Specht* nor *Nguyen* are instructive in the instant matter in light of the overwhelming precedent that click-wrap agreements, like Yelp's Terms of Service, are enforceable. *Swift*, 805 F. Supp. 2d, at 912; *Tompkins*, 2014 U.S. Dist. LEXIS 88068, at *29; *Holl*, 2017 U.S. Dist. LEXIS 153317 at *12.

Yelp's Terms of Service are the conditions to which Plaintiff agreed to in exchange for being able to use Yelp's website as a registered user, benefits Yelp had no obligation to provide to him without such agreement. Plaintiff renewed his agreement to Yelp's Terms of Service with every login, and these transactions and his ongoing use plainly evidence an EBR between Plaintiff and Yelp.

-4-

### 2. Use of Yelp's Service is a Business Transaction

Plaintiff also incorrectly argues that his continued uses of Yelp are not transactions that constitute an EBR between the parties because Yelp's Terms of Service limit use of the site to "non-commercial use only." Opp. at 10:9-15. Plaintiff conflates the issues. The transactions that give rise to the EBR come from Plaintiff's habitual use of Yelp pursuant to Yelp's Terms of Service.

The fact that a provision of Yelp's Terms of Service state that Plaintiff could not use Yelp for his own commercial benefit (except as permitted by Yelp) is a separate issue that goes to how Plaintiff was allowed to use Yelp, and is irrelevant here. Following Plaintiff's reasoning, a purchase from Costco of snacks labeled "not for resale," would not qualify as a transaction because the buyer is restricted by Costco's terms of the sale and cannot resell the snacks. The FCC "rejects proposals to define a business relationship [in such a narrow fashion] . . . because such narrow definitions may exclude legitimate categories of business relationships." 7 FCC Rcd. 8752, 8771, ¶ 35. Purchasing snacks from Costco is the transaction—what the buyer may or may not do with the snacks afterwards is immaterial for the purpose of identifying if an EBR exists.

In exchange for the use of various Yelp benefits unavailable to non-subscribers, Plaintiff assented to Yelp's Terms of Service when he created his account and each time that he later logged in to his account. MacBean Decl. ¶¶ 9-12. The parties' continual exchange of consideration (use of Yelp in exchange for Plaintiff's continued agreement to Yelp's Terms of Service) constitute ongoing, repeated transactions that give rise to a long-established EBR between the parties.

### C. Voluntary Two-Way Communications Occurred Between Yelp and Plaintiff

Plaintiff admits that he communicated with Yelp through actions like posting reviews, reporting the reviews of others, and suggesting edits to Yelp business pages. Opp. at 8:1-4, 17-18 ("Mr. Sapan sent a few error reports" and "Mr. Sapan used to post to Yelp's other users [and] made complaints"). Plaintiff's entire argument that Yelp and Plaintiff do not have an EBR hinges on his contention that Yelp supposedly did not "show that Yelp communicated back in any way." Opp. at 8:16-19.

### 1. The EBR Should not be Construed Narrowly

Plaintiff fails to provide a single citation to case law to support that the phrase "two-way communications" should be construed so narrowly. "The FCC has opined that the established business relationship exemption is broad and that you have an established business relationship with a person or entity if you have made an inquiry, application, purchase, or transaction regarding products of [sic] services offered by such person or entity." *Van Patten v. Vertical Fitness Grp., LLC*, 2013 U.S. Dist. LEXIS 189845 *24 n.4 (S.D. Cal. Nov. 8, 2013) (citing *Carnett's Inc. v. Hammond*, 610 S.E.2d 529, 531-32 (Ga. 2005)); *see also* 7 FCC Rcd. 8752, 8771, ¶ 35.

Accordingly, Plaintiff has an EBR with Yelp based on Plaintiff's repeated transactions with Yelp. He used Yelp's messaging system (MacBean Decl. ¶ 22, Ex. K), made reports to Yelp regarding other users' reviews (*id.* at ¶ 23, Ex. H); posted reviews on Yelp (*id.* at ¶ 19, Ex. H); and, logged in to Yelp and viewed Yelp business pages hundreds of times. *Id.* at ¶¶ 18, 27, Ex. H. Plaintiff engaged in these transactions as a registered user of Yelp's service, pursuant to his acceptance of Yelp's Terms of Service. *Id.* at ¶¶ 9-12, Exs. B, C, H.

### 2. Plaintiff and Yelp Engaged in Two-Way Communications

Regardless, Plaintiff's contention that Yelp did not participate in a "two-way communication" is incorrect. Yelp sent emails to Plaintiff regarding his Yelp account usage (such as emails about the friend requests he initiated). MacBean Decl. ¶ 26, Ex. H. Also, in response to Plaintiff's suggested edits to Yelp business pages, live Yelp representatives responded with "emails informing [Plaintiff] of the status of his edits to business pages on Yelp." *Id*. The same is true when Plaintiff reported other users' reviews—Plaintiff made the reports and live Yelp representatives evaluated his reports and responded to him accordingly. *Id.*

There were also "two-way communications" when the parties exchanged consideration during the creation and continued use of Plaintiff's Yelp account (*supra* Section B), and each time that Yelp provided results in response to Plaintiff's search inquiries or otherwise responded to Plaintiff's actions. Indeed, Yelp communicated regularly to Plaintiff in response to his various requests through the service, such as displaying the dozens of reviews he requested that Yelp show. As other examples,

1 Yelp also, at Plaintiff's request, sent invitations to befriend other Yelp users and messages to other Yelp users—benefits Plaintiff could not have requested absent his registration for a Yelp account. Plaintiff and Yelp engaged in voluntary[3] two-way communications and an EBR between the parties exists.

### D. An EBR Does not Require the Furnishing of a Telephone Number

An EBR is formed "by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call…" 47 CFR 64.1200(f)(5). Neither the TCPA nor any FCC Order mandates that the called party provide his/her phone number to form an EBR. *Id.*

Plaintiff confuses the EBR exception with the consent exception. 47 CFR § 64.1200 (c)(2)(ii) (A party making telephone solicitations "will not be liable for violating this requirement if . . . [i]t has obtained the subscriber's prior express invitation or permission. Such permission must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller *and includes the telephone number to which the calls may be placed . . .*") (emphasis added). The EBR exception, on the other hand, details no such requirement. *See* 47 CFR § 64.1200(f)(5).

It is also possible that Plaintiff confuses the EBR requirement with the extra requirements for exceptions to liability in fax cases under the TCPA. 47 CFR § 64.1200(a)(4)(i), (ii) (Sending unsolicited advertisements to a fax machine violates the TCPA unless, "[t]he unsolicited advertisement is from a sender with an established business relationship, as defined in paragraph (f)(6) of this section, with the recipient; **and** . . . [t]he sender obtained the number of the telephone facsimile machine through" various outlined methods) (emphasis added). The Legislature states that the EBR element is separate and apart from the requirement that a phone number be obtained. *In the*

---

[3] "Voluntary" is defined as "[d]one by design or intention." *Voluntary*, Black's Law Dictionary (7th ed. 1999). Yelp intentionally and by design responded to Plaintiff's actions through its service, in accordance with Plaintiff's requests. MacBean Decl. ¶ 26, Ex. H. Yelp's communications with Plaintiff were, therefore, voluntary.

-7-

1  *Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18
2  FCC Rcd. 19890, 19892, ¶ 5 (Oct. 3, 2003) (heightening standard for exceptions to liability in fax
3  cases) ("[T]he Commission's determination that an established business relationship will no longer
4  be sufficient to show that an individual or business has given express permission to receive unsolicited
5  facsimile advertisements will go into effect as required by the *Order on Reconsideration*.").

Each the consent and the fax EBR exception clearly delineate that a phone number must be furnished; but, the EBR exception applicable to this case—which does not involve faxes—does not include this extra requirement. 47 CFR 64.1200(f)(5). This was purposeful. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States,* 464 U.S. 16, 23 (1983).

Plaintiff again fails to cite to any case law supporting his contention that a phone number must be furnished to establish an EBR. Plaintiff's only citation is to *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) (Opp. at 9:4-26), which has absolutely no bearing on the instant matter—*Satterfield* discusses only text messages and consent. *Satterfield*, 569 F.3d. at 954-55. The term "established business relationship" does not appear once in the decision. *See generally id.*

There is no requirement that a number be furnished during a transaction in order for an EBR to exist. 47 CFR § 64.1200(f)(5). Yelp and Plaintiff have an EBR.

### E. Yelp's Calls to Plaintiff do not Give Rise to Liability

As a final attempt to avoid summary judgment, Plaintiff argues that, regardless of his EBR with Yelp, Yelp's calls violate the TCPA because "Yelp tried to call somebody else." Opp. at 9:24-27. The EBR exception does not contain such a requirement, (47 C.F.R. Section 64.1200(c), (f)(5)), and Plaintiff fails to point to any authority supporting his contention. In fact, courts do not discuss the substance of the calls when the parties have an EBR. *Abante Rooter & Plumbing, Inc. v. Alarm.com, Inc.*, 2017 U.S. Dist. LEXIS 69307 *19 n.10 (N.D. Cal. May 5, 2017) (finding "[u]nder the relevant FCC regulation, Alarm.com would have an established business relationship ('EBR') that permits it to contact individuals who contacted Alarm.com," without inquiry into subject matter

of calls); *Hovila v. Tween Brands, Inc.*, 2010 U.S. Dist. LEXIS 34861, *14 (W.D. Wash. April 7, 2010) (finding calls do not violate TCPA if parties' "relationship falls within the EBR exemption to the TCPA" without discussing substance of calls).

Furthermore, Yelp's calls to Plaintiff were regarding Yelp, the very service that gave rise to the parties' EBR. Plaintiff could easy anticipate a call from Yelp about Yelp. Therefore, Yelp's calls to Plaintiff do not violate the TCPA.

### III. CONCLUSION

Yelp's calls to Plaintiff did not violate the TCPA. At the time of Yelp's alleged calls, the parties had an EBR, arising from Plaintiff's consistent use of Yelp and the parties' repeated transactions in which Plaintiff agreed to Yelp's Terms of Service in exchange for his ability to use features of Yelp's service available only to registered users. Additionally, the parties have a publisher-subscriber relationship, which the FCC has specifically identified as an EBR. The facts and legal authorities indisputably establish that the parties had an EBR. Therefore, Yelp's alleged calls to Plaintiff cannot give rise to a TCPA violation and Plaintiff has no viable claims here.

Yelp respectfully requests that this Court grant its Motion for Summary Judgment.

Dated: March 21, 2018

Respectfully submitted,

MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.

*/s/ Nicole V. Ozeran*

By: Joshua Briones
     Nicole V. Ozeran
     Claire C. Newland
     Attorneys for Defendant Yelp Inc.