Joshua Briones (SBN 205293)
jbriones@mintz.com
Nicole V. Ozeran (SBN 302321)
nvozeran@mintz.com
MINTZ LEVIN COHN FERRIS GLOVSKY
   AND POPEO P.C.
2029 Century Park East Suite 3100
Los Angeles, CA 90067
Telephone:  310-586-3200
Facsimile:   310-586-3202

Claire C. Newland (SBN 301017)
ccnewland@mintz.com
MINTZ LEVIN COHN FERRIS GLOVSKY
   AND POPEO P.C.
44 Montgomery Street, 36th Floor
San Francisco, CA 94104
Telephone:  415-432-6000
Facsimile:   415-432-6001

Attorneys for Defendant
Yelp Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JONATHAN SAPAN, individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>     vs.<br><br>YELP INC., a Delaware Corporation,<br><br>          Defendant. | Case No.  3:17-cv-03240-JD<br><br>**DEFENDANT YELP INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Hearing:<br>Date:          April 19, 2018<br>Time:         10:00 a.m.<br>Dept.:         11<br>Judge:        Honorable James Donato<br><br>Complaint Filed:  June 6, 2017 |

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND INFORMATION .......................................................................1

    A.     Plaintiff is a Serial TCPA Litigant Who Has Filed More Than Twenty Cases. ......1

    B.     Plaintiff Has Used at Least Eleven Phone Numbers in the Past Ten Years. ...........3

        1.     Landline Number 858-324-9001 (Phone Number in Complaint)...............3

        2.     Landline Number 858-433-9808.................................................................3

        3.     Landline Number 619-819-5687.................................................................3

        4.     Wireless Number 857-225-1131 ................................................................4

        5.     Google Voice Phone Numbers....................................................................4

    C.     Plaintiff Has Used False Identities and "Burner" Generated Phone Numbers. .......4

    D.     Plaintiff Contradicted His Allegations Regarding Adverse Health Effects.............6

III.    LEGAL STANDARD.............................................................................................6

IV.     ARGUMENT..........................................................................................................8

    A.     Plaintiff's Class Definitions Are Deficient. ............................................................8

    B.     Individual Issues Predominate over Common Issues in Rules 23(a)(2)
        and 23(b)(3). ...........................................................................................................9

        1.     Individualize Inquiries Will Be Necessary to Determine Whether
            a Class Member's Phone Number Was Eligible to be Placed on
            the DNC Registry at the Time of the Call...................................................10

        2.     Individualized Inquires Are Necessary to Determine Whether a Class
            Member Had an EBR with Yelp.................................................................11

        3.     Individualized Inquiries Are Necessary to Determine Whether
            Yelp Obtained Prior Express Written Consent from a Class Member. ......13

        4.     Individualized Inquiries Will Be Necessary to Determine Whether
            a Class Member Registered a VoIP Number. .............................................14

        5.     Individualized Inquiries Will Be Necessary to Determine Whether
            a Class Member Agreed to Arbitration and a Class Action Waiver. .........15

        6.     Individualized Inquiries Will Be Necessary to Determine Whether
            Yelp Called the Registered Number More Than Once in a Year. .............15

    C.     Plaintiff Is Not a Typical Member of the Proposed Class. ...................................15

        1.     Plaintiff Is Atypical Because He Is a Professional Litigant Who
            Lacks Article III and Prudential Standing. ................................................16

        2.     Plaintiff Has an Established Business Relationship with Yelp.................17

    D.     Plaintiff and His Counsel Are Inadequate. ...........................................................18

# **TABLE OF CONTENTS**

**Page(s)**

1.    Plaintiff Is an Inadequate Class Representative Because He is Not Trustworthy...................................................................................18

2.    Plaintiff's Credibility Issues Are Relevant to the Litigation, Unlike the Credibility Issues in *Harris*..................................................20

3.    Counsel Are Unable to Fairly and Adequately Represent the Class Because of Their Inexperience, Lack of Resources, and Inability to Comply with Federal Rules. ......................................................20

E.    Plaintiff Fails to Show Numerosity.......................................................23

    1.    If a Class Is Identifiable, It Is Not Numerous. ............................24

    2.    Plaintiff Resorts to Speculation to Guess the Size of the Class................24

F.    The Proposed Class Is Not Manageable, and Thus, Classwide Adjudication Is Not Superior.........................................................26

G.    The Proposed Class Is Not Ascertainable. ...........................................26

V.    CONCLUSION...............................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

1

2
**Federal Cases**

3
*Amchem Prods. v. Windsor*,
4
   521 U.S. 591 (1997) ............................................................................................................ 9

5
*Berlowitz v. Nob Hill Masonic Mgmt.*,
   No. C-96-01241 MHP, 1996 U.S. Dist. LEXIS 22599 (N.D. Cal. Dec. 6, 1996) ........................ 8
6

*Blair v. CBE Group, Inc.*,
7
   309 F.R.D. 621 (S.D. Cal. 2015) ............................................................................................ 7, 9

8
*Bonilla v .United Brands Company*,
9
   Case No. 11-cv-0386-MRP-DTB (E.D. Cal., filed Jan. 13, 2011) ............................................. 21

10
*Briseno v. ConAgra Foods, Inc.*,
   844 F.3d 1121 (9th Cir. 2017) ............................................................................................ 7, 27
11

12
*Brodsky v. Humanadental Ins. Co.*,
   269 F. Supp. 3d 841 .............................................................................................................. 10

13
*Conde v. Open Door Mtkg.*,
14
   LLC, 223 F. Supp. 3d 949 (N.D. Cal. 2017) ............................................................................ 15

15
*Davis v. AT&T Corp.*,
   No. 15-cv-2342-DMS (DHB), 2017 U.S. Dist. LEXIS 46611 (S.D. Cal. March 28, 2017) ....... 10
16

17
*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) .................................................................................................. 6

18
*G.M. Sign, Inc. v. Brink's Mfg. Co.*,
19
   No. 09-C-5528, 2011 U.S. Dist. LEXIS 7084 (N.D. Ill. Jan. 25, 2011) .............................. 10, 13

20
*Harris v. Vector Marketing Corp.*,
   753 F. Supp. 2d 996 (N.D. Cal. 2010) .................................................................................... 20
21

22
*In re Computer Memories Sec. Litig.*,
   111 F.R.D. 675 (N.D. Cal. 1986) ........................................................................................... 18

23
*In re Rules Implementing the Tel. Consumer Prot. Act.of 1991*,
24
   30 F.C.C Rcd. 1830 (2012) ..................................................................................................... 13

25
*Jovel v. Boiron, Inc.*,
   No. 11-cv-10803-SVW-SHx2, 2014 U.S. Dist. LEXIS 35908 (C.D. Cal. Feb. 27, 2014).... 18, 20
26

27
*Klein v. Commerce Energy, Inc.*,
   246 F. Supp. 3d 563 (W.D. Pa. 2017) .................................................................................... 14

28

-iii-

# TABLE OF AUTHORITIES

**Page(s)**

*Meyer v. Bebe Stores, Inc.*,
  No. 14-CV-00267-YGR, 2016 U.S. Dist. LEXIS 188999 (N.D. Cal. Aug. 22, 2016)............... 26

*Nghiem v. Dick's Sporting Goods, Inc.*,
  318 F.R.D. 375 (C.D. Cal. 2016) ............................................................. 7, 16, 18, 20

*Orsatti v. Quicken Loans, Inc.*,
  No. 2:15-cv-09380-SVW-AGRa, 2016 U.S. Dist. LEXIS 182873 (C.D. Cal. Sept. 2016) ........ 13

*Perine v. Sega of Am., Inc.*,
  No. 13-cv-01962-JD, 2015 U.S. Dist. LEXIS 62326 (N.D. Cal. May 15, 2015)
  (Donato, J.)....................................................................................................... 7

*Physicians Healthcare, Inc. v. Allscripts Health Sols. Inc.*,
  No. 12-C-3233, 2017 U.S. Dist. LEXIS 84696 (N.D. Ill. June 2, 2017).................................... 19

*Sapan v. Solarmax Tech., Inc.*,
  No. 15cv897-MMA-MDD, 2015 U.S. Dist. LEXIS 141360 (S.D. Cal. Oct. 16, 2015)........ 22, 23

*Staton v. Boeing*,
  327 F.3d 938 (9th Cir. 2003) ................................................................................ 18

*Stoops v. Wells Fargo Bank, N.A.*,
  197 F. Supp. 3d 782 (2016) ................................................................... 16, 17, 19

*Sweet v. Pfizer*,
  232 F.R.D. 360 (C.D. Cal. 2005) ............................................................................ 23

*True Health Chiropractic, Inc. v. McKesson Corp.*,
  No. 13-cv-02219-HSG, 2016 U.S. Dist. LEXIS 111657 (N.D. Cal. Aug. 22, 2016).................. 10

*Valentino v. Carter-Wallace, Inc.*,
  97 F.3d 1227 (9th Cir. 1996) ................................................................................ 26

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)...................................................................................... 7, 9

## Other State Cases

*Bonilla v. United Brands Company*,
  Case No. 2:11-cv-00386-PA-DTB (C.D. Cal. filed on Jan. 13, 2011) ........................................ 21

## Federal Statutes

47 U.S.C. § 227(b)(1)(A)(iii) ................................................................................... 14

47 U.S.C. § 227(b)(5) ............................................................................................ 15

Telephone Consumer Protection Act ............................................................. *passim*

## TABLE OF AUTHORITIES

**Page(s)**

**Other Authorities**

47 C.F.R. § 64.1200(c)(2) .......................................................................................... 11

47 C.F.R §§ 64.1200(c)(2)(iii), (e), (f)(5) ................................................................. 11

47 C.F.R. § 64.1200(f)(5) .......................................................................................... 12

Fed. R. Civ. P. 23(a)(1) ......................................................................................... 1, 23

Fed. R. Civ. P. 23(a)(4) ....................................................................................... 18, 20

Fed. R. Civ. P. 23(b)(3)(A)-(D) .......................................................................... 6, 7, 26

Fed. R. Civ. Proc. 23(g)(1)(A)(i)-(iv) ......................................................................... 20

Fed. R. Civ. Proc. 23(g)(1)(B) .................................................................................... 23

Fed. R. Civ. P. 23(a) ..................................................................................... 6, 7, 23, 26

## I.     INTRODUCTION

Plaintiff Jonathan Sapan ("Plaintiff") moves to certify a class under Federal Rules of Civil Procedure 23(a) and 23(b)(3).[1]  This case should not be certified as a class because it would require mini-trials for each class member, who are not even ascertainable, to decide dispositive liability issues for each individual, such as whether an established business relationship exists, whether the individual provided prior express written consent, or whether an enforceable arbitration agreement with Yelp exists.  Plaintiff has not asserted a viable theory using generalized proof to establish liability with respect to the proposed class.

Plaintiff would also be an inadequate and untrustworthy class representative.  He has created false identities and generated temporary phone numbers, some of which were only used for a day, to bait companies to call him back so that he could determine their identities and then file suit under the Telephone Consumer Protection Act ("TCPA").  He is a career plaintiff who has filed more than twenty TCPA cases (and threatened many more), yet none have resulted in class certification.  The unique defenses stemming from Plaintiff's pattern of deceptive behavior will prejudice the interests of the class.  Plaintiff's counsel are also inadequate because of their lack of complex litigation and class action experience, lack of resources, and demonstrated inability to comply with federal and local rules.

## II.    BACKGROUND INFORMATION

### A.     Plaintiff is a Serial TCPA Litigant Who Has Filed More Than Twenty Cases.

Plaintiff is a professional TCPA litigant who regularly works with the law firm of Prato & Reichman to file cases.  Beginning in 2006, two years after Plaintiff graduated from Princeton University with a degree in electrical engineering, Plaintiff began regularly sending demand letters to companies for alleged violations of the TCPA.  Declaration of Claire Newland ("Newland Decl.")

---

[1] In a last ditch effort, Plaintiff seeks relief under Rule 23(b)(2) in his Memorandum of Points and Authorities in Support of Motion for Class Certification ("Mot.").  Mot. 21:20-22:5, ECF No. 66-1. Plaintiff did not move to certify a class pursuant to Rule 23(b)(2) in his Notice of Motion.  Pl.'s Notice of Mot. and Mot. for Class Certification, ECF No. 66.  Plaintiff's request is therefore improper; nonetheless, Plaintiff has failed to establish Rule 23(b)(2)'s requirements for the reasons set forth in this Opposition.

Ex. A, at 24:12-23, 95:19-24.  If a company did not submit to Plaintiff's demands, he subsequently filed a TCPA lawsuit.  Plaintiff testified that he had filed "about ten" TCPA lawsuits.  *Id.* at 49:18-20.

In actuality, Plaintiff has filed at least eighteen TCPA lawsuits, including this case, in state and federal court.  Yelp's Request for Judicial Notice ("Yelp's RJN") Exs. 1-17.  In addition to these eighteen lawsuits, he has filed at least three TCPA cases in small claims court where he represented himself.  Newland Decl. Ex. A, at 96:11-24.  In total, Plaintiff has filed at least twenty-one TCPA lawsuits since 2006, more than twice his estimate.  Yet not a single one of these cases resulted in a class certification.  *Id.* at 231:25-232:3; *see* Yelp's RJN, Exs. 1-17.

Additionally, Plaintiff has personally sent "dozens" of demand letters alleging violations of the TCPA to businesses.  *Id.* at 57:23-58:2; 62:23-25.  Plaintiff could not recall how many additional demand letters his attorneys have sent on his behalf, explaining, "I have no idea because I don't know when a demand letter is or is not sent in a case."  *Id.* at 78:4-21.

Plaintiff has filed so many TCPA lawsuits and sent so many TCPA demand letters, it is difficult for him to recall who he has sued:

> Q: So you've – you've sued a lot of parties.  Is it hard to keep track of everyone?
> [Mr. Reichman's objections]
> A: So are you asking me, is it hard to keep track of everyone? Is that the question?
> Q: Of the parties you've sued."
> A: It is hard to keep track of every single party that is named on – yes."

*Id.* at 75:10-76:2.

There is no question that Plaintiff has derived income from TCPA litigation in the form of individual (*i.e.*, not classwide) monetary settlements.  *Id.* at 100:24-101:1 ("Q: You've derived money from [TCPA] litigation, correct? A: Yes."); *id.* at 231:25-232:3; *see* Yelp's RJN, Exs. 1-17.  In fact, at least ten percent of Plaintiff's annual income comes from TCPA settlements:

> Q: Do settlements from TCPA litigation make up a meaningful party of your annual income?
> A: In some –
> [Mr. Reichman's objections]
> Q: In some years, yes.
> …

-2-

Q: You said that your annual earnings are, as of now, around $100,000. What would be a noticeable amount from TCPA litigation?
[Mr. Reichman's objections]
A: Noticeable may not be the right word, but sticking with that, I'd say at least $10,000.

*Id.* at 103:5-104:3.

TCPA litigation is a family business for Plaintiff. His brother, Paul Sapan, also files TCPA lawsuits and has been represented by Prato & Reichman. *Id.* at 56:4-17, 106:11-17. Plaintiff introduced Paul Sapan to Mr. Reichman. *Id.* at 106:24-107:1.

**B.    Plaintiff Has Used at Least Eleven Phone Numbers in the Past Ten Years.**

**1.    Landline Number 858-324-9001 (Phone Number in Complaint)**

Plaintiff obtained the landline phone number at issue in this case, 858-324-9001, prior to August 1, 2013, the date he registered the phone number on the national do-not-call ("DNC") list. Compl. ¶ 19, ECF No. 1. The phone number's area code (858) is for San Diego, California. Newland Decl. Ex. A, at 164:23-25. Plaintiff first used this phone number when "experiment[ing]" with the phone provider Phone.com. *Id.* at 167:16-22. He selected the phone number because he found the number ending in 9001 to be a "very easy . . . number to remember." *Id.* at 166:11-14. Plaintiff lived in San Diego from 2008 to 2015, but then moved back to the East Coast. *Id.* at 19:17-19, 164:12-14. He currently resides in Massachusetts and still has the 858-324-9001 phone number through the voice over internet ("VoIP") service provider Vonage. *Id.* at 165:4-23.

**2.    Landline Number 858-433-9808**

Plaintiff obtained the landline phone number 858-433-9808 in or around 2006. *Id.* at 64:10-65:11. Plaintiff registered this phone number on the DNC list on or around 2008. *Id.* at 65:12-21. He did not recall when he "got rid" of this phone number. *Id.* at 64:18-20.

**3.    Landline Number 619-819-5687**

Plaintiff could not recall when he obtained the landline phone number 619-819-5687. *Id.* at 66:6-67:3. He testified that he registered this phone number on the DNC list "somewhere around

January 2011." *Id.* at 66:16-20.   He did not recall when he stopped using the phone number.  *Id.* at 67:2-3.

### 4.    Wireless Number 857-225-1131

Plaintiff has the wireless phone number 857-225-1131.  *Id.* at 168:24-169:2.  Plaintiff has had this wireless phone number since 2006 and still uses this phone number today.  *Id.* at 69:11-17; 170:15-17.

### 5.    Google Voice Phone Numbers

Plaintiff's current Google Voice phone number is 858-314-8854.  *Id.* at 171:24-25.  He has also used (at least) one "random number" on Google Voice.  *Id.* at 171:20-23.  Plaintiff has sent demand letters involving phone numbers that he used through Google Voice.  *Id.* at 171:10-13.  In addition to these two Google Voice phone numbers, Plaintiff has also "created a Google Voice phone number for the purposes of, say, invest – investigating a telemarketer.  So, in other words, that I can give them a number that doesn't give them any permission to call a number that I actually use."  *Id.* at 172:1-8.  It is unknown how many temporary Google Voice phone numbers Plaintiff has used.  *Id.* at 172:3-6.  He admits that he has used random numbers for his "investigations," and that some of these numbers may have been registered on the DNC list.  *Id.* at 221:18-25 ("It's possible that there's some numbers that I've, like, used, as I mentioned, for investigation, and I don't know whether those are registered on the do not call list or not.").

### C.    Plaintiff Has Used False Identities and "Burner" Generated Phone Numbers.

Plaintiff has used at least two false identities when communicating with companies.  He admits that he has called telemarketers and provided an alias, typically "Jack Barnes" or "Sam Kinison," and a phone number.  In one such recording, Plaintiff states: "Hi, this is Jack Barnes, Quantum Solutions. 858-412-7655. Thanks."  Newland Decl. Ex. B (Audio Recording).  Plaintiff recognized the voice in this message as his and identified the phone number as one he used through Google Voice.  *Id.* at Ex. A, 213:5-9, 214:2-4.  The number is no longer active.  *Id.* at 222:21-25.  When asked how many

1   aliases he has made up, Plaintiff testified, "It's often – It can be on the spot," but then recanted, "I

2   think it's one or two tops." *Id.* at 215:7-9.

3       Plaintiff's self-admitted purpose of calling these telemarketers through fake aliases was to

4   "try[] to get them to call [Plaintiff] back and identify themselves." *Id.* at 215:20-21. In addition to

5   using Google Voice phone numbers, Plaintiff has used temporary phone numbers through

6   applications, such as the "Burner app" that generate phone numbers for "a one-time use." *Id.* at

7   223:11-23, 225:2-16. Plaintiff estimates that he has created "less than five or six" phone numbers to

8   use for a period of one day. *Id.* at 223:24-224:12. He uses these phone numbers to "track down"

9   telemarketers. *Id.* It is impossible to verify how many temporary phone numbers Plaintiff used to

10  contact telemarketers because, as succinctly stated by Plaintiff, applications like Burner "burn the

11  number" after use. *Id.* at 225:2-16 ("[I]t doesn't send you a record of the number.").

12      As explained by Plaintiff, his "investigation" process entails the following:

13      The way they typically go is you get a robocall, again with a concealed caller ID or
    just a bogus caller ID. . . . And then what I do is I leave – again, so as to not give

14  them any iota of permission to call – continue calling me, I give them a number that I
    use for investigative purposes. I give them a name that is not my name so that they

15  cannot later claim that I gave them permission and then I wait to call back – wait for
    them to call back and see who calls me back.

16

17  *Id.* at 218:5-23. In sum, Plaintiff is fraudulently baiting companies to call him back at one of his

18  investigative numbers so that he can determine their identity and then sue them if he received prior

19  calls from them. As part of this methodical strategy, he maintains a spreadsheet where he documents,

20  every one to two days, the date, the time, caller ID, caller ID name, and any additional comments

21  after he receives a call from an entity. *Id.* at 195:12-22. Plaintiff identified at least one entity—

22  Homeytel—that he sued after identifying the company through his investigative process. *Id.* at 216:5-

23  20, 221:18-25.

24      It is impossible to verify how many phone numbers Plaintiff has used since 2006 because of

25  his use of Google Voice and applications that generate temporary phone numbers. He has had three

26  landline phone numbers, one wireless phone number, at least two Google Voice phone numbers

27  (Plaintiff admits more numbers were generated for investigative purposes), and approximately five,

28

DEFENDANT YELP INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
CASE NO. 3:17-cv-03240-JD

although the number is likely greater, temporary phone numbers generated through applications such as Burner.

### D.   Plaintiff Contradicted His Allegations Regarding Adverse Health Effects.

In his Complaint, Plaintiff alleges he has suffered from "the aggravation and consequent health effects of stress these illegal intrusions have caused." Compl. ¶ 37, ECF No. 1. Plaintiff claims that he has endured stress as a result of alleged telemarketing calls. However, at his deposition, Plaintiff admitted that he did not suffer any adverse health effects as a result of Yelp Inc.'s ("Yelp") calls:

> Q: What health effect is specifically related to the calls from Yelp?
>
> A: I'm not claiming that there's any health effect that is only related to the calls from Yelp.

Newland Decl. Ex. A, at 208:4-7. Rather, Plaintiff would complain about general telemarketing calls to his friends:

> Q: Did you talk about the stress caused by Yelp calls with anyone?
> A: Anyone who was around to listen, sure, I'd bitch about, you know, another telemarketer calling me today or the other day, et cetera.

*Id.* at 207:15-19.

Plaintiff experienced significant stress in his life in 2016 and 2017. Around the same time period when Yelp called Plaintiff, Plaintiff "did not like [his] job very much," and he stopped speaking with this family. *Id.* at 209:13-22, 246:10-15.

## III.   LEGAL STANDARD

"Parties seeking class certification bear the burden of demonstrating that they have met each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Federal Rules of Civil Procedure 23(b)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 978-80 (9th Cir. 2011). Rule 23(a) requires a party seeking class certification to establish four elements: commonality, typicality, adequacy, and numerosity. Fed. R. Civ. Proc. 23(a).

"At the certification state, district courts must engage in a rigorous analysis of each 23(a) factor when determining whether plaintiffs seeking class certification have met the requirements of

-6-

Rule 23." *Blair v. CBE Group, Inc.*, 309 F.R.D. 621, 625 (S.D. Cal. 2015) (internal quotation marks omitted) (quoting *Ellis*, 657 F.3d at 980).  "Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule--that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Here, Plaintiff moves for certification of one class of call recipients under Rules 23(a) and 23(b)(3).  *See generally* Mot., ECF No. 66-1.  Rule 23(b)(3) requires a party seeking class certification to establish that common questions of law or fact predominate over individual questions and that a class action is superior to other forms of adjudication.  Fed. R. Civ. Proc. 23(b)(3).  "A central concern of the Rule 23(b)(3) predominance test is whether adjudication of common issues will help achieve judicial economy." *Blair*, 309 F.R.D. at 625 (internal quotation marks omitted) (quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001)*, amended on other grounds* 273 F.3d 1266 (9th Cir. 2001)).

The party seeking class certification "must first define an ascertainable and identifiable class." *Nghiem v. Dick's Sporting Goods, Inc.*, 318 F.R.D. 375, 379 (C.D. Cal. 2016) (quoting *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 163 (C.D. Cal. 2002)).  "The Court also regards as well-established and uncontroversial that '[i]n addition to the explicit requirements of Rule 23, an implied prerequisite to class certification is that the class must be sufficiently definite; the party seeking certification must demonstrate that an identifiable and ascertainable class exists.'" *Perine v. Sega of Am., Inc.*, No. 13-cv-01962-JD, 2015 U.S. Dist. LEXIS 62326, at *5 (N.D. Cal. May 15, 2015) (Donato, J.) (quoting *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011)).  Even if this Court determines that an ascertainability analysis is not required following the Ninth Circuit's decision in *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017), this Court's Rule 23(a) analysis must still consider "definitional deficiencies," such as whether the proposed class definition is uncertain or overbroad.  *Id.* at 1125 n.4.

1

## IV.   ARGUMENT

2

### A.   Plaintiff's Class Definitions Are Deficient.

3

As noted by Plaintiff, its description of the class in its Motion for Class Certification differs

4

from the one pled in the Complaint.  Mot. 6:10-6, ECF. No. 66-1; Compl. ¶ 5, ECF No. 1.  This Court

5

is "bound by the class definition provided in the Complaint," and therefore should not "consider

6

certification of the class beyond the definition provided in the complaint unless plaintiffs choose to

7

amend it."  *Berlowitz v. Nob Hill Masonic Mgmt.*, No. C-96-01241 MHP, 1996 U.S. Dist. LEXIS

8

22599 (N.D. Cal. Dec. 6, 1996).

9

Under either proposed class definition, Plaintiff has failed to meet the requirements of

10

Rule 23.  Notably, Plaintiff cannot ascertain a class based on either definition.  Plaintiff's purported

11

class is based solely on speculative data concerning unverified (and unverifiable) anonymous

12

complaints reported by consumers on the DNC list—none of which identify a single person stating

13

he or she was actually called by Yelp.  Mot. 8:11-9:8, ECF No. 66-1.  This is insufficient to identify

14

a class.  Plaintiff asserts that, "Yelp has both the call records themselves and records in their

15

SalesForce lead tracking software which can easily run reports like generating a list of all phone

16

numbers in the database and the dates and times for all calls."  *Id.* at 14:18-21.  Despite Plaintiff's

17

apparent willingness to mask casual speculation as an actual fact, this statement is untrue.

18

In fact, Yelp cannot generate a report that contains call records in the manner Plaintiff

19

speculates.  Newland Decl. Ex. C (Decl. of Corinna King-Brown Decl.), at ¶ 6.  Any search involving

20

a large amount of data will time out and return no information or results in Salesforce.com.  *Id.* at ¶ 5.

21

Even if such a report could be generated, and it cannot, it would be unreliable and would contain

22

irrelevant information.  *Id.* at ¶ 7.  The report would contain numbers that Yelp never called, along

23

with personal calls made by Yelp sales representative while at work, and other inaccurate data.  *Id.* at

24

¶¶ 6-10.  To resolve these inaccuracies, each of the tens of millions of calls in the Salesforce.com call

25

records, which cannot be generated, would have to be investigated on a call-by-call basis.  *Id.* at ¶ 10.

26

Yelp uses another reporting tool, Yelp's Data Warehouse, but it too would be unable to

27

generate a large-scale report relevant to this litigation.  *Id.* at ¶ 12.  Yelp lacks an automated method

28

-8-

of running a query in the Data Warehouse to generate a report for all phone numbers called within a given time period by all Yelp representatives.  *Id.* at ¶ 13.  If Yelp developed custom SQL code or other software to query the Data Warehouse, which may not even be possible, the output of the query would be in an extremely large comma separated values ("CSV") file.  *Id.* at ¶ 14.

Yelp would then have to develop other custom software to separate the resulting extremely large CSV file into smaller files in order to be able view the contents.  *Id.*  It is unknown how long this process would take.  *Id.*  The results of the Data Warehouse query would include the same inaccuracies associated with the hypothetical Salesforce.com report.  *Id.* at ¶¶ 15-16.  The Data Warehouse query would raise additional accuracy issues because Data Warehouse reports do not include the name of the business associated with a phone call.  *Id.* at ¶ 17.  In order to identify the business associated with a call in a Data Warehouse report, Yelp would need to match the business ID provided in the report with a business profile in Salesforce.com, and there is no automated function that can perform this task.  *Id.*  Due to the unavailability of any means to identify Plaintiff's proposed class, the proposed class cannot be certified.

**B.    Individual Issues Predominate over Common Issues in Rules 23(a)(2) and 23(b)(3).**

Rule 23(a)(2) requires that the party seeking certification show that "there are common questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  But, the existence of common questions itself will not satisfy the requirement.  Rather, "[w]hat matters to class certification . . . is . . . the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores*, 564 U.S. at 350.  Although similar to the commonality requirement, the test for predominance under Rule 23(b)(3) is "far more demanding," testing "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623-24 (1997).

In TCPA actions, the predominance inquiry is satisfied only when the plaintiff "advance[s] a viable theory employing generalized proof to establish liability with respect to the class involved." *Blair v. CBE Group, Inc.*, 309 F.R.D. 621, 628 (2015) (quoting *Connelly v. Hilton Grand Vacations*

*Co., LLC*, 294 F.R.D. 574, 577 (S.D. Cal. 2013); *Davis v. AT&T Corp.*, No. 15-cv-2342-DMS (DHB), 2017 U.S. Dist. LEXIS 46611, at *16 (S.D. Cal. March 28, 2017) (finding class certification improper because individualized inquires would predominate); *True Health Chiropractic, Inc. v. McKesson Corp.*, No. 13-cv-02219-HSG, 2016 U.S. Dist. LEXIS 111657, at *13-14 (N.D. Cal. Aug. 22, 2016) (denying class certification when plaintiffs "have not offered their own satisfactory method of establishing a lack of 'express permission' via class-wide proof"); *see Brodsky v. Humanadental Ins. Co.*, 269 F. Supp. 3d 841, 848-49 (decertifying the class because idiosyncratic consent issues defeated superiority and predominance); *G.M. Sign, Inc. v. Brink's Mfg. Co.*, No. 09-C-5528, 2011 U.S. Dist. LEXIS 7084, at *22-23 (N.D. Ill. Jan. 25, 2011) (denying class certification because the established business relationship defense would force the court to "engage in a class-member-specific inquiry").

Plaintiff fails to explain how individualized inquires could be performed via class-wide proof, and instead focuses on three questions that Plaintiff contends are common to all class members:

> (1)    Did Yelp make the calls to the class,
> (2)    [W]here [sic] they telemarketing, in nature, and
> (3)    [W]ere the numbers on the DNC Registry.

Mot. 10:6-9, ECF No. 66-1.   Plaintiff's three questions over-simplify this case and fail to address how liability issues will be resolved on a classwide basis.   To resolve liability issues, the following questions are necessary:

> (1)    Was the called number eligible for, and appropriately placed on the DNC Registry at the time of the call?
> (2)    Did the call recipient have an established business relationship ("EBR") with Yelp?
> (3)    Did the call recipient provide prior express written consent to be contacted by Yelp?
> (4)    Was the called number a VoIP number?
> (5)    Did the call recipient agree to arbitration and a class action waiver?
> (6)    Was the number called more than once by Yelp within a twelve month period?

Answers to these questions will vary on a member-by-member basis.

> **1.    Individualize Inquiries Will Be Necessary to Determine Whether a Class Member's Phone Number Was Eligible to be Placed on the DNC Registry at the Time of the Call.**

Yelp's sales team members call business representatives affiliated with businesses listed on Yelp's business pages.   Declaration of Kathryn Hasenmueller ("Hasenmueller Decl.")   ¶¶ 2, 5.   The

DNC Registry is only for personal phone numbers.  *Consumer Information*, National Do Not Call Registry, *available at* https://www.consumer.ftc.gov/articles/0108-national-do-not-call-registry (last visited March 19, 2018).  Business lines should not be registered on the DNC and the TCPA does not impose liability for calls to business numbers improperly placed on the DNC.  *Id.*; 47 C.F.R. § 64.1200(c)(2) (prohibiting calls to only "residential telephone subscriber[s]").  Although business lines should not be placed on the DNC, this does not prevent business representatives from doing so.  Thus, the Court would have to determine whether the class member's phone number listed on the DNC belonged to a business or was used for business purposes.

Determining whether a phone number is associated with a business will require an individualized, multi-step inquiry.  Small businesses or sole proprietors—especially professionals like roofers, plumbers, or handymen—may provide their wireless or residential numbers to Yelp sales employees in a variety of ways.  Hasenmueller Decl. ¶¶ 3-4.  As part of this inquiry, the Court would have to engage in a class-member specific inquiry as to who provided each phone number to Yelp and in what capacity—an inquiry that would require thorough review of documents (including administrative records from Yelp's website, emails to and from sales employees, and any call recordings) related to these facts for each phone number.

### 2.   Individualized Inquires Are Necessary to Determine Whether a Class Member Had an EBR with Yelp.

An exemption to the national DNC list exists for consumers with whom the entity has an established business relationship.  *See* 47 C.F.R §§ 64.1200(c)(2)(iii), (e), (f)(5).  If the phone number was not associated with a business, the Court would still have to engage in a class-member-specific inquiry to determine whether any class member had an established business relationship with Yelp at the pertinent time.  The Court would need to evaluate evidence such as each class member's use of Yelp, historical transactions with Yelp, and whether the class member ever asked Yelp to stop calling or terminate his or her business relationship with Yelp.

Here, Yelp's investigation into whether it had an EBR with Plaintiff demonstrates why this inquiry is highly individualized and intensive.  Yelp evaluated Plaintiff's log-in history, email and

-11-

notification subscription preferences, registration and agreement to Yelp's Terms of Service, Yelp profile page, history of authoring reviews on Yelp, history of sending direct messages through Yelp's messaging platform, history of inviting friends to join Yelp, history of reporting other users' reviews to Yelp for supposed violations of Yelp's policies, and history of suggesting edits to business listings on Yelp. *See generally* Yelp's Mot. for Summary Judgment ("Yelp's MSJ"), ECF No. 64; Ian MacBean Decl. in Support of Yelp's MSJ, ECF No. 65. Yelp also had to analyze the substance of Plaintiff's comments and Yelp's responses to Plaintiff's suggested edits and reports regarding other users' comments. *See* Yelp's MSJ, ECF 64. This analysis would have to be conducted for each class member.

In addition to the investigation that Yelp undertook for Plaintiff, the Court would have to examine other relevant factors to determine whether Yelp had an EBR with a class member. For example, although providing a phone number is not required for an EBR to exist, a class member providing his or her phone number to Yelp would be even further evidence of a "prior existing relationship" and a "voluntary two-way communication" with Yelp, which are factors in the EBR analysis. 47 C.F.R. § 64.1200(f)(5). There are various ways that a class member could have provided its phone number to Yelp.

A class member may have provided his or her phone number over the phone or through e-mail to any Yelp sales employee. Hasenmueller Decl. ¶ 4. A class member may have provided his or her phone number when she registered or claimed a Yelp business page or directly. Declaration of Ian MacBean in Opposition to Plaintiff's Motion for Class Certification ("MacBean Decl.") ¶ 8. A class member may have provided his or her phone number directly to a Yelp Community Manager. *Id.* at ¶ 10. Because Yelp calls numbers associated with business listings, the Court would have to analyze individual business records to determine whether and how the class member provided their phone number to Yelp. *Id.* at ¶ 12. In short, the way in which a phone number is provided to Yelp is a highly individualized inquiry that would effectively create mini-trials for each class member.

As part of the EBR inquiry, the Court would also have to analyze whether and how each class member agreed to Yelp's Terms of Service. Agreeing to Yelp's Terms of Service constitutes a

transaction between Yelp and the class member, thereby establishing a publisher-subscriber relationship that qualifies as an EBR. *See* Yelp's Reply in Support of Motion for Summary Judgment ("Yelp's Reply") 3, ECF No. 71.  In addition to the ways that Plaintiff agreed to Yelp's Terms of Service, a class member could have agreed to Yelp's Terms of Service in many other ways, such as when he or she registered or claimed a Yelp Business Page.[2]  MacBean Decl. ¶¶ 7, 9, Ex. A.

If the Court determines than an EBR exists between Yelp and a class member, the Court would then have to inquire if the relationship was terminated, *i.e.*, whether the class member asked Yelp specifically to stop calling him or her.  As a result of the myriad ways in which class members could have formed an EBR with Yelp, "it seems unavoidable that the Court would have to conduct a series of mini-trials to determine the facts of prior business relationships . . . .  It would have to do so both to establish the population of the class, and to determine liability." *G.M. Sign*, 2011 U.S. Dist. LEXIS 7084, at *26.

> **3.   Individualized Inquiries Are Necessary to Determine Whether Yelp Obtained Prior Express Written Consent from a Class Member.**

"Under § 64.1200(c)(2)(ii), there is an exemption relieving the caller of liability if it obtained the residential telephone subscriber's express invitation or permission, evidenced by a written agreement which states the consumer agrees to be contacted and includes the telephone number to which the calls may be placed." *Orsatti v. Quicken Loans, Inc.*, No. 2:15-cv-09380-SVW-AGRa, 2016 U.S. Dist. LEXIS 182873, *10 (C.D. Cal. Sept. 2016) (citing *In Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C Rcd. 14014, 14043 (2003)).  Based on the exemption, the Court would have to determine whether Yelp obtained prior express written consent from each class member.  This can only be done through individualized inquiries.

Call recipients may provide their phone number to Yelp through e-mail, which constitutes express written consent under the TCPA.  *See In re Rules Implementing the Tel. Consumer Prot. Act.of 1991*, 30 F.C.C Rcd. 1830, 1843-44 (2012) (recognizing that consent obtained via email or

---

[2] Registering or claiming a Yelp business page also demonstrates that the class member's phone number was used for business purposes, and thus not eligible to be listed on the DNC Registry.

website forms is prior express written consent).  It is common for small businesses and sole proprietors to provide their cell phone or residential numbers to Yelp sales team members via e-mail. Hasenmueller Decl. ¶¶ 4-5.  Yelp has even provided an example where a business representative provided Ms. Hasenmueller her residential phone number so that Ms. Hasenmueller could call her at home.  *Id.* at Ex. A.  Given this is just one example of one business representative providing a residential number in writing to one Yelp sales employee, the Court would have to conduct an individualized inquiry, looking at any emails from class members to Yelp employees (or other forms of written consent, such as completion of online forms), to determine whether a class member provided prior express written consent to be contacted by Yelp over the phone.

Following the recent decision in *ACA International v. Federal Communications Commission*, the Court would also have to determine whether the phone number was reassigned, and if so, whether the prior owner provided prior express written consent to be contacted by Yelp.  *See* No. 15-211, at *31, 40  (D.C. Cir. March 16, 2018) (finding the one call safe-harbor rule arbitrary).[3]

### 4.    Individualized Inquiries Will Be Necessary to Determine Whether a Class Member Registered a VoIP Number.

Free VoIP numbers are not covered by the TCPA because the call recipient is not charged for calls.  *Klein v. Commerce Energy, Inc.*, 246 F. Supp. 3d 563, 581-83 (W.D. Pa. 2017) (granting summary judgment where Plaintiff received telemarketing calls on his "free Google voice over Internet Protocol").  In *Klein*, the court held that free VoIP numbers are not subject to the TCPA under the "charged call provision." *Id.* at 577; *see* 47 U.S.C. § 227(b)(1)(A)(iii) (It shall be unlawful to make any call "to any telephone number assigned to . . . any service for which the called party is charged for the call.").  As there is no way to conclude by looking at a phone number whether it is a free VoIP number, the Court would have to undergo an individualized inquiry to determine whether Yelp called a VoIP number, and then whether the VoIP number is free.

---

[3] The D.C. Circuit suggested that a party may not be liable under the TCPA if it calls a reassigned wireless number based on the mistaken, but reasonable, belief that the owner of the receiving number had given consent, when in fact the former owner provided consent. Although this ruling applied to artificial or prerecorded calls, the logic does not differ for live calls.

1

2

**5.      Individualized Inquiries Will Be Necessary to Determine Whether a Class Member Agreed to Arbitration and a Class Action Waiver.**

3

4

Another question that raises individualized inquiries is whether a class member agreed to

5

arbitration and waived his or her participation in a class action.  *See Conde v. Open Door Mtkg.*, LLC,

6

223 F. Supp. 3d 949, 957-58 (N.D. Cal. 2017) (denying class certification because the majority of the

7

proposed class had signed arbitration agreements, but the class representatives had not, and were thus

8

unable to demonstrate typicality, commonality, predominance and superiority).  If a class member

9

purchased an advertising package from Yelp, which would also be evidence that the class member's

10

phone number was used for business purposes and the class member had an EBR with Yelp, the class

11

member would have signed a contract with Yelp. Hasenmueller Decl. ¶ 6.  All Yelp advertising

12

contracts contain a provision mandating arbitration and waiving class actions.  *Id.* at Ex. B.  The Court

13

would have to inquire on a member-by-member basis to determine whether the class member agreed

to arbitration and a class action waiver.

14

**6.      Individualized Inquiries Will Be Necessary to Determine Whether Yelp Called the Registered Number More Than Once in a Year.**

15

16

Lastly, the Court would have to determine whether each class member received more than one

17

call from Yelp in a twelve-month period.  *See* 47 U.S.C. § 227(b)(5) ("A person who has received

18

more than one telephone call within any 12-month period by or on behalf of the same entity" has a

19

private right of action under the TCPA).  Yelp cannot be liable if it called a class member only once

20

in a twelve-month period. *See id.* Yelp is unaware of any software or data query that would allow the

Court to answer this question.

21

In sum, Plaintiff's proposed methodology, or lack thereof, for resolving liability issues on a

22

classwide basis is insufficient and the Court would be overwhelmed with mini-trials for each

23

individual class member.

24

**C.      Plaintiff Is Not a Typical Member of the Proposed Class.**

25

Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of

26

the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[A] named plaintiff's motion for class

27

28

-15-

certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Nghiem*, 318 F.R.D. at 381 (internal quotation marks omitted) (quoting *Gary Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

Here, there is such a danger. In the event that Yelp's Motion for Summary Judgment is not granted (although it should be), Yelp will assert at least two defenses with respect to Plaintiff—(1) Plaintiff lacks Article III and prudential standing and (2) Plaintiff has an EBR with Yelp. These defenses will be a focus of this litigation, and consequently, Plaintiff's claims are not typical of the purported class as required by Rule 23(a)(3).

### 1. Plaintiff Is Atypical Because He Is a Professional Litigant Who Lacks Article III and Prudential Standing.

Plaintiff's claims are not typical of the proposed class because he is a professional TCPA litigant, and as a result, lacks Article III standing. *See Nghiem*, 318 F.R.D. at 381 (denying class certification where plaintiff, a professional TCPA litigant, failed to satisfy the typicality requirement); *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782, 790 (2016) (granting summary judgment in favor of defendants because plaintiff, a professional TCPA litigant, was not the type of consumer that Congress intended the TCPA to protect). Counsel for Yelp recently learned of Plaintiff's extensive litigation history and deceptive practices at his deposition on March 12, 2018. Newland Decl. ¶ 1.

In *Stoops*, the plaintiff admitted that she filed TCPA actions as a business. *Stoops*, 197 F. Supp. 3d at 798. At the time of the litigation, she had filed at least eleven TCPA cases in the Western District of Pennsylvania and sent approximately twenty pre-litigation demand letters. *Id.* Her sister had also filed TCPA lawsuits of her own. *Id.* The court determined that the plaintiff did not have constitutional or prudential standing. Ms. Stoops lacked constitutional standing because her privacy interests were not violated when she received calls from the defendant. *Id.* at 800. Because she was in the business of filing TCPA lawsuits, "the calls are not a 'nuisance and an invasion of privacy.'" *Id.* (quoting *In re Rules Implementing the Tel. Consumer Prot. Act. of 1991*, 30 FCC Rcd. at 7980). Ms. Stoops lacked prudential standing because her interests, which included purchasing cell phones

-16-

1  with the hopes of receiving calls from creditors in order to collect statutory damages, were not within

2  the zone of interests protected by the TCPA.  *Id.* at 805-06.

3      Although Plaintiff is savvy enough to not directly state that he pursues TCPA litigation as a

4  business, his conduct proves otherwise.  Plaintiff's methodical behavior is more egregious than Ms.

5  Stoops's—he has filed at least twenty TCPA lawsuits, sent "dozens" of demand letters, generated

6  temporary phone numbers and used fake aliases to determine the identity of callers and then sued

7  them, and tracked calls from purported telemarketers in a regularly-updated spreadsheet.  Plaintiff is

8  more sophisticated than Ms. Stoops in that he has used randomly generated phone numbers, rather

9  than a "box full of cell phones," to communicate with companies.  *Id.* at 796.

10     Plaintiff's testimony further establishes that his privacy was not invaded because he wanted

11 to receive calls from Yelp in order to pursue TCPA litigation against Yelp.  Newland Decl. Ex. A at

12 212:3-8. ("Q: Why didn't you block the calls from Yelp in this case if they were so annoying? A:

13 Because if I thought that they were telemarketing calls, then my desire to take action leads me to

14 answer those calls so I can find out who's behind them.").  Even if Plaintiff has an interest in punishing

15 telemarketers, that will not satisfy Article III standing requirements.  *Stoops*, 197 F. Supp. 3d at 802

16 (quoting *Leyse v. Bank of Am. Nat'l Ass'n*, 904 F.3d 316, 324 (3rd Cir. 2015) ("Someone with a

17 generalized interest in punishing telemarketers, for example, would not qualify on that basis alone.").

18     Given Plaintiff's patterned conduct, it is "unfathomable that Congress considered a consumer

19 who files TCPA as a business when it enacted the TCPA."  *Id.* at 804 (quoting *Leys*e, 804 F.3d at

20 325).  Indeed, Plaintiff is not the consumer who Congress envisioned when it created the TCPA, and

21 he is an atypical member of the proposed class.

22              **2.      Plaintiff Has an Established Business Relationship with Yelp.**

23     Plaintiff's claims are also not typical of the proposed class because he had an established

24 business relationship with Yelp when he received the calls from Yelp, as detailed in Yelp's pending

25 Motion for Summary Judgment.  *See* Yelp's MSJ, ECF No. 64.  Since 2013, when he registered for

26 a Yelp account to receive benefits only available to subscribers, Plaintiff has actively used Yelp on

27 nearly 500 different dates, authored and posted forty-two reviews, and used many other specialized

28

DEFENDANT YELP INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
CASE NO. 3:17-cv-03240-JD

1    features available only to registered Yelp users.  *See* Yelp's Reply 2:8-15, ECF No. 71; *see generally*

2    Yelp's MSJ, ECF No. 64.  These continuous and repeated transactions between the parties form an

3    EBR.

4         While Plaintiff contends that Yelp's affirmative defenses are "completely speculative and

5    highly unlikely," this is irrelevant for class certification purposes.  Mot. 15:13-15, ECF No. 66-1.  "It

6    does not matter whether [Yelp] will ultimately prevail on these defenses.  What matters is that [Yelp]

7    will assert these defenses, and [it has] a factual basis for doing so." *Nghiem*, 318 F.R.D. at 383 n.4.

8         **D.    Plaintiff and His Counsel Are Inadequate.**

9         To satisfy adequacy, Plaintiff must establish that "the representative parties will fairly and

10   adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Rule 23(a)(4)'s requirement

11   considers whether the representative plaintiffs and their counsel have any conflicts of interest with

12   other class members and whether the representative plaintiffs and their counsel will prosecute the

13   action vigorously on behalf of the class." *Staton v. Boeing*, 327 F.3d 938, 957 (9th Cir. 2003).

14
          **1.    Plaintiff Is an Inadequate Class Representative Because He is Not
15                 Trustworthy.**

16        "The honesty and credibility of a class representative is a relevant consideration when

17   performing the adequacy inquiry because an untrustworthy plaintiff could reduce the likelihood of

18   prevailing on the class claims." *Jovel v. Boiron, Inc.*, No. 11-cv-10803-SVW-SHx2, 2014 U.S. Dist.

19   LEXIS 35908, at *7 (C.D. Cal. Feb. 27, 2014) (quoting *Harris v. Vector Marketing Corp.*, 753 F.

20   Supp. 2d 996, 1016 (N.D. Cal. 2010)).  "[I]t is self-evident that Court must be concerned with the

21   integrity of individuals it designates as representatives for a large class of plaintiffs." *In re Computer*

22   *Memories Sec. Litig.*, 111 F.R.D. 675, 682 (N.D. Cal. 1986) (citing *Cohen v. Beneficial Indus. Loan*

23   *Corp.*, 337 U.S. 541, 549 (1949) (finding "diligence, wisdom, and integrity" of class representatives

24   important considerations)).

25        Here, Plaintiff is untrustworthy and not credible, in part, because he has created false identities

26   and used a mobile app, "Burner," to generate temporary phone numbers in an effort to pursue TCPA

27   litigation.  Plaintiff admitted to these examples of deception at his deposition. *See supra* Section II.C.

28
                                              -18-

1    Based on his methodical and misleading actions, Plaintiff lacks credibility on matters critical to the

2    litigation—whether Plaintiff has suffered the type of concrete injury-in-fact that the TCPA is designed

3    to prevent.  *See Stoops*, 197 F. Supp. 3d at 801-02.

4         Plaintiff's pattern and practice of "investigating" (*i.e.*, creating false aliases in the hopes that

5    a company would call him back) demonstrates that he is not within the "zone of interests" that

6    Congress intended the TCPA to protect.  *Id.* at 803-04.  It appears highly likely based on his testimony

7    that Plaintiff created false identities and set up multiple, temporary, and untraceable phone numbers

8    to call companies, wait for the companies to return his call, determine their identity, and then sue

9    them.  This scheme has proved successful for Plaintiff at least once—the *Homeytel* case.  Newland

10   Decl. Ex. A, at 216:5-20, 221:18-25; *see* Yelp's RJN Ex. 2.  Considering that *Homeytel* was one of

11   Plaintiff's first TCPA actions and that he uses false aliases "often," he has likely used far more than

12   two false identities to pursue TCPA litigation.  *Id.* at 215:8-9.

13        As he did at his deposition, Plaintiff will likely deny that he considers his TCPA litigation a

14   "business."  But, "[e]ven if a plaintiff denies the charges against it that denial alone does not settle

15   the issues in its favor.  Saying so doesn't make it so." *Physicians Healthcare, Inc. v. Allscripts Health*

16   *Sols. Inc.*, No. 12-C-3233, 2017 U.S. Dist. LEXIS 84696, at *25 (N.D. Ill. June 2, 2017) (denying

17   class certification in TCPA litigation on the grounds that plaintiff was an inadequate representative

18   because he admitted to the falsity of interrogatory answers).  Plaintiff has filed at least twenty lawsuits

19   related to the TCPA—although none have resulted in class certification, demonstrating his

20   willingness to take individual gain over benefits for the purported class.  He recalled at least eleven

21   telephone numbers, but did not know how many temporary numbers he generated through Google

22   Voice or the Burner application.  *See supra* Section II.C.  Based on his conduct, the only reasonable

23   conclusion is that TCPA litigation is his business and a significant source of income for Plaintiff.  His

24   interests conflict with purported class members who do not rely on calls from businesses for financial

25   gain.

26        Common sense dictates that Plaintiff's use of aliases separately calls into question Plaintiff's

27   credibility, honesty, and integrity.  By its very nature, the use of false identities is dishonest.  It is

28

-19-

likely that a fact-finder would find Plaintiff to be untrustworthy, which could jeopardize putative class members' interests.  *See Jovel*, 2014 U.S. Dist. LEXIS, at *7 (denying class certification because plaintiff gave conflicting testimony regarding an issue relevant to the litigation).

### 2. Plaintiff's Credibility Issues Are Relevant to the Litigation, Unlike the Credibility Issues in *Harris*.

Here, Plaintiff's use of aliases and temporary phone numbers to pursue TCPA litigation as a business directly relates to Article III and prudential standing issues.  If Plaintiff is the class representative, he and his counsel will have to devote most of their time and resources trying to defend Plaintiff's character, motivation, and credibility.  *Nghiem*, 318 F.R.D. at 383.  This "diversion of resources" will hinder counsel's ability to prosecute this case on behalf of the rest of the class.  *Id.* Plaintiff cannot fairly and adequately protect the class' interests as required by Rule 23(a)(4).

In comparison, in *Harris*, this Court found that general credibility issues did not render the class representative inadequate.  There, the defendant, plaintiff's employer, argued that plaintiff lacked the credibility necessary to serve as a class representative based on inconsistent deposition testimony related to how her employer treated her.  753 F. Supp. 2d at 1015-16.  The case turned on issues involving training, and thus, plaintiff's testimony, while inconsistent, was not relevant.  *Id.* at 1015.  *Harris* is inapposite from the case at hand.

### 3. Counsel Are Unable to Fairly and Adequately Represent the Class Because of Their Inexperience, Lack of Resources, and Inability to Comply with Federal Rules.

In appointing class counsel, courts must consider the following non-exhaustive factors: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class.  Fed. R. Civ. Proc. 23(g)(1)(A)(i)-(iv).  Courts may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  *Id.* at 23(g)(1)(B).

Counsel lacks the requisite experience to adequately represent the proposed class.  Plaintiff is represented by Justin Prato and Christopher Reichman, attorneys, who according to their website, specialize in Social Security Disability Insurance disputes.  *Prato & Reichman: Social Security Disability Attorneys*, *available at* http://www.prato-reichman.com/ (last visited March 21, 2018).  To represent a claimant in a Social Security Disability Insurance dispute, one need not be an attorney. Social Security Administration*, Your Right to Representation*, *available at* https://www.ssa.gov/pubs/EN-05-10075.pdf  ("You can have a representative, such as an attorney or non-attorney, help you when you do business with Social Security") (last visited March 18, 2018). Mr. Prato claims no experience in complex or class actions.  *See generally* Decl. of Justin Prato ("Prato Decl."), ECF No. 66-3.  Based on his lack of experience in complex or class actions, Mr. Prato cannot fairly and adequately represent the proposed class.

Mr. Reichman states he has experience as lead counsel in two state court complex cases and that he worked on a "legal team" for two "dip fee" class action cases.  Decl. of Christopher J. Reichman ("Reichman Decl.") ¶ 9, ECF No. 66-5.  Notably, both dip fee cases settled before class certification.  *See* Newland Decl. Exs. E-F.  Mr. Reichman cites a third case as an example of his class action experience, *Bonilla v .United Brands Company*, Case No. 11-cv-0386-MRP-DTB (E.D. Cal., filed Jan. 13, 2011). Reichman Decl. ¶ 9.  But, this case does not exist.  *See* Newland Decl. ¶ 6. Presumably, Mr. Reichman is referring to *Bonilla v. United Brands Company*, Case No. 2:11-cv-00386-PA-DTB (C.D. Cal. filed on Jan. 13, 2011), which was transferred to the Southern District of California. *See id.* at Ex. D.  Like the dip fee cases, this case also settled prior to class certification. *Id.*  It is also unclear what work Mr. Reichman did on these cases as a member of the "legal team." He was not lead counsel, nor was he listed in the attorney caption on the docket in any of these three proposed class actions.  *See id.* at Exs. D-F.  Mr. Reichman's inability to recount the case in which he supposedly participated further evidences his lack of experience.

Counsel also lack the resources to prosecute a class action.  The firm Prato & Reichman is comprised of only two attorneys, and if the class is certified, it is unlikely that two attorneys could adequately represent and manage purportedly millions of class members.  Counsel does not specify

how it will represent a class in this case.  Counsel's sloppy prosecution of this case to date makes it appear that they are already overwhelmed and unable to vigorously prosecute this case.

There are numerous examples of counsel's sloppy prosecution thus far.  First, the allegations in the Complaint pertaining to the dates of the alleged calls from Yelp to Plaintiff are inconsistent with the dates provided in Jonathan Sapan's Declaration filed in Support of Plaintiff's Motion for Class Certification.  *Compare* Compl. ¶ 24, ECF No. 1 *with* Decl. of Jonathan Sapan ("Sapan Decl") ¶ 2, ECF No. 66-4.  Second, the two pleadings also differ with respect to whether Yelp left voicemails.  *Compare* Compl. ¶¶ 27-33, ECF No. 1 *with* Sapan Decl. ¶¶ 4-10, ECF No. 66-4.  Third, Plaintiff's Initial Discovery Disclosures reference a third party that is not involved in this litigation (Poshmark), as well as text messages, which are not at issue in this litigation.  Newland Decl. Ex. G.  Fourth, counsel has not amended its Complaint despite its use of a new proposed class in its Motion for Class Certification.  Mot. 6:8-16.  Fifth, counsel publicly filed Yelp's attorneys' eyes only information in violation of the parties' Protective Order and Local Rule 79-5.  *See* Pl.'s Admin. Mot. to Remove Incorrectly Filed Documents, ECF No. 70.  Such carelessness is likely a result of churning out numerous actions involving Mr. Sapan, thereby rendering counsel and Plaintiff unable to recall or verify facts and allegations relevant to this litigation, or comply with local rules.

Lastly, although Mr. Reichman states he is experienced in "the use of the Federal Rules of Civil Procedure" (Reichman Decl. ¶ 12), he has been sanctioned for violating the Federal Rules of Civil Procedure and the Local Rules for the Southern District of California.  *See Sapan v. Solarmax Tech., Inc.*, No. 15cv897-MMA-MDD, 2015 U.S. Dist. LEXIS 141360, *1 (S.D. Cal. Oct. 16, 2015).  In another TCPA case in which he represented Plaintiff, Mr. Reichman failed to appear telephonically at a Settlement Disposition Conference, appeared late at Early Neutral Evaluation/Case Management Conference, and failed to appear at an Order to Show Cause hearing arising from his prior failure to appear.  *Id.* The Court had notified him of all proceedings through automatic Notices of Electronic Filings.  Mr. Reichman "offered the excuse that the conference[s] had not been calendared."  *Id.* at *2-4, 9.  He provided no explanation as to why he did not appear at the Order to Show Cause hearing.

1   *Id.* at *4, 10.[4]  Mr. Reichman's irresponsible and sanctioned conduct, in a non-complex case involving

2   only one plaintiff, further reinforces that he will not be able to "fairly and adequately represent the

3   interests of the class."  Fed. R. Civ. Proc. 23(g)(1)(B).

4   Counsel's lack of experience with class actions and failure to comply with federal and local

5   rules demonstrate that counsel cannot adequately serve as class counsel.  The "assembly line quality"

6   of counsel's work thus far compounds counsel's inadequacy.  *Sweet v. Pfizer*, 232 F.R.D. 360, 370-

7   71 (C.D. Cal. 2005) (finding counsel who had poor work quality, failed to follow federal rules, and

8   lacked class action experience inadequate to represent a class).  Additionally, "because the abundance

9   of individual issues in this case bars a finding of typicality, adequacy of representation is necessarily

10  lacking as well."  *Id.* at 370 (citing *In re Paxil Litig.*, 212 F.R.D. 539, 550 (C.D. Cal. 2003) (denying

11  class certification because of a focus on the individual plaintiff).  Simply stated, counsel cannot fairly

12  and adequately protect the interest of the purported class.

13  **E.  Plaintiff Fails to Show Numerosity.**

14  Rule 23(a) requires that proposed class be "so numerous that joinder of all members is

15  impracticable."  Fed. R. Civ. P. 23(a)(1).  Plaintiff has not explained how he will identify class

16  members, and instead relies on conjecture and inapplicable data.

17  Yelp cannot produce a call log or report that would reflect all calls made during a certain time

18  period.  *See supra* Section IV.A.  Yelp's Salesforce.com application also cannot create a report of all

19  numbers contained in the millions of Yelp business profiles, which could then be compared to the

20  DNC Registry.  *Id.*  And, even if such a report could be generated, it would include numbers that were

21  never called by Yelp and the data would be inherently unreliable and irrelevant.  *Id.*  Likewise, Yelp

22  lacks a method of running a query for all phone numbers called by Yelp within a certain time period

23  in its separate Data Warehouse.  *Id.*

24

25  _____

26  [4] The Southern District of California required Mr. Reichman to pay a $1,000.00 fine, self-report to
    the California Bar, and referred the matter to this District's Disciplinary Committee.  *Id.* at *4.  On
    Mr. Reichman's Motion to Reconsider the Order Imposing Sanctions, the Court reduced the fine to

27  $500.00 and eliminated the self-reporting to the California Bar.  *Id.* at 11.  It is unclear whether the
    matter was referred to the Southern District's Disciplinary Committee, and if so, what resulted.

28

1

### 1.    If a Class Is Identifiable, It Is Not Numerous.

2

Any purported class is likely small.  Yelp's sales team members do not call residential phone

3

numbers unrelated to businesses listed on Yelp, and businesses are not protected by the DNC.  For

4

example, no call recipient has ever informed Ms. Hasenmueller, an experienced member of Yelp's

5

Sales team and one of Yelp's 30(b)(6) witnesses, that the dialed phone number was a residential line

6

unrelated to a business.  Hasenmueller Decl. ¶ 7.

7

Yelp's various vetting processes also ensure that the phone numbers published on Yelp

8

business pages are accurate.  MacBean Decl. ¶¶ 4-6.  Yelp's users, whether consumer users like

9

Plaintiff or business users managing Yelp business pages, can suggest edits to factual information

10

displayed on a Yelp business page, including phone numbers, and can create new pages with such

11

information.  *Id.* at ¶¶ 4, 6.  Yelp vets these suggestions to confirm the phone number is for the right

12

business.  *Id.* at ¶¶ 6-7.

13

Generally, Yelp seeks to verify information within forty-eight hours after a business page has

14

been added to Yelp or after an edit has been suggested by a consumer or business, although Yelp

15

often verifies information sooner.  *Id.* at ¶ 5.  Because of its intensive vetting procedures, the

16

likelihood of Yelp calling a phone number not affiliated with a business is scant.  Indeed, despite

17

calling business numbers for well over a decade, this is the first legal threat Yelp has faced asserting

18

violations of the DNC provisions of the TCPA.

19

Furthermore, during his deposition, Plaintiff could not identify one member of the purported

20

class, but believes they exist based on internet blogs and sites he could not recall.  *Id.* at 75:10-76:2

21

("Q: Aside from yourself, do you know someone that has been called at their residential number by

22

Yelp? A: I do not know anyone personally.  I have read reports of it.").  Yelp is unaware of any such

23

reports to date.

24

### 2.    Plaintiff Resorts to Speculation to Guess the Size of the Class.

25

Plaintiff contends that numerosity exists and that the class consists of millions of numbers,

26

and that Yelp has called numbers registered on the DNC called at least 19.6 million times.  Mot. 4:24-

27

26, ECF No. 66-1.  In support of this argument, Plaintiff cites the Federal Trade Commission's Do

28

DEFENDANT YELP INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
CASE NO. 3:17-cv-03240-JD

1    Not Call Registry Data Book for Fiscal Year 2016 (the "Data Book") and a 2013 Yelp blog post.  *Id.*

2    at 8:11-24.  The Data Book is not relevant to the facts of this case and its contents are disputable.

3    Significantly, the Data Book "accepts all complaints regarding calls using a recorded message,

4    **regardless of the registration status of the called number.**"  *Id.* (emphasis added).  The Data Book

5    includes statistics about consumers who are not listed on the DNC Registry, and is therefore outside

6    the scope of this litigation.  Moreover, the Data Book is based on "unverified complaints reported by

7    consumers" in which the consumer was asked "Have you asked this company to stop calling you?"

8    or "Was the call a recorded message?"  *See* Plaintiff's Request for Judicial Notice at 5 n.1, ECF No.

9    66-2.  Here, Plaintiff's answer to both questions would be "no," and if he is typical of his class (which

10   he is not), class members' responses would also be no.   It is undisputed that he did not tell Yelp to

11   stop calling him and that Yelp's calls were live.  Yelp's MSJ 11:5-15, ECF No. 64.  The Federal

12   Trade Commission also does not disclose identifying information about consumers who submitted

13   complaints, or suggest that any such information exists.  Thus, the Data Book is irrelevant, unverified,

14   *and* unverifiable.

15          Plaintiff's reliance on the 2013 Yelp blog post is also misplaced for many reasons.  First, the

16   nineteen percent error rate referenced in the blog represents both incorrect or missing phone numbers.

17   Missing phone numbers are not relevant to this litigation.  Second, incorrect phone numbers are often

18   disconnected lines or lines connected to a different business, which are also not relevant to this

19   litigation.  Third, it is impossible to determine whether the numbers in this sample were residential or

20   registered on the DNC Registry when Yelp called them.  Fourth, the sample size is small, only 1,000

21   businesses.  Fifth, the blog post does not mention residential numbers, only business numbers.  Sixth,

22   as recognized in the blog, many of the businesses in the sample were located outside of the United

23   States where data is more likely to be missing or incorrect.  Seventh, the blogger acknowledged that

24   "[n]either the relative weighting of lists nor our assumptions are perfect."  Prato Decl. Ex. 13, ECF

25   No. 66-18.  Eighth, the data is from 2013, and thus, is outdated and largely irrelevant.  For at least

26   these eight reasons, the blog post cannot be used to determine the numerosity of the purported class.

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**F.      The Proposed Class Is Not Manageable, and Thus, Classwide Adjudication Is Not Superior.**

To qualify for certification under Rule 23(b)(3), a class must meet two requirements in addition to the Rule 23(a) prerequisites: (1) common questions of law or fact must "predominate over any questions affecting only individual members," and (2) class resolution must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Here, individualized issues predominate common questions. *See supra* Section IV.B. Plaintiff also fails to establish that a class resolution is superior to other methods of adjudication.

Courts consider four non-exhaustive factors when determining whether a class action is superior to individual suits: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

In this case, a classwide action is not superior to individual suits because there will be difficulties in managing the class action. Specifically, the individualized inquiries explained in Section IV.B. will dominate, resulting in mini-trials under the guise of a class action. Because of these manageability issues, a classwide action will not "reduce litigation costs" nor "promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1235 (9th Cir. 1996).

**G.      The Proposed Class Is Not Ascertainable.**

"In addition to the four requirements set forth in Rule 23(a), most courts have implied an additional threshold requirement that the members of the class be readily ascertainable." *Meyer v. Bebe Stores, Inc.*, No. 14-CV-00267-YGR, 2016 U.S. Dist. LEXIS 188999, at *7 (N.D. Cal. Aug. 22, 2016). "For a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria." James W. Moore, 5-23 Moore's Federal Practice, Civil § 23.21[3][a] (2018).

1     In its Motion, Plaintiff cites *Briseno v. ConAgra Foods, Inc*. for the sweeping proposition that

2 "there can be no doubt that there is no 'ascertainability' requirement in this circuit [sic]."  Mot. 13:5-

3 6, ECF No. 66-1.  Plaintiff's characterization of *Briseno* is inaccurate.  The Court clarified that it

4 "refrain[ed] from referring to 'ascertainability' in this opinion because courts ascribe widely varied

5 meanings to that term."  *Briseno*, 844 F.3d at 1124 n.3.

6     The Ninth Circuit does not have its own definition of ascertainability, but recognizes that the

7 Court has addressed "definitional deficiencies," which other courts have referred to as

8 "ascertainability issues," through the enumerated requirements of Rule 23.  *Id.* at 1125 n.4.  The

9 proposed class is deficient because class members cannot be identified.  As explained *supra* in Section

10 IV.A., Yelp cannot use either of its databases to generate large-scale reports reflecting the millions of

11 phone numbers contained in Yelp business profiles or phone numbers called by all Yelp

12 representatives in a given time period.  Plaintiff does not provide an objective criteria to identify class

13 members, and therefore fails to meet the ascertainability requirement.

14 **V.**　**CONCLUSION**

15     For the reasons stated herein, the Court should deny Plaintiff's motion to certify this putative

16 class action.

17 Dated:  March 23, 2018　　　　　　Respectfully submitted,

18 　　　　　　　　　　　　　　　MINTZ LEVIN COHN FERRIS GLOVSKY AND
19 　　　　　　　　　　　　　　　POPEO P.C.

20 　　　　　　　　　　　　　　　　　/s/ Claire C. Newland

21 　　　　　　　　　　　　　By:　Joshua Briones
　　　　　　　　　　　　　　　Nicole V. Ozeran
22 　　　　　　　　　　　　　　　Claire C. Newland
　　　　　　　　　　　　　　　Attorneys for Defendant Yelp Inc.